270 F.2d 65
 Charles O. MARTIN, Raymond F. Farrar and wife, Hazel M.
Farrar, and Floyd H. Martin, Appellants and Cross-Appellees,
v.
UNITED STATES of America, Appellee and Cross-Appellant.
 No. 7793.
 United States Court of Appeals Fourth Circuit.
 Argued Jan. 8, 1959.
Decided June 8, 1959, Rehearing Denied Sept. 3, 1959, As
Amended Oct. 2, 1959.
 
 D. Newton Farnell, Jr., and William E. Comer, Greensboro, N.C. (James G. W. MacClamroch, Greensboro, N.C., on brief), for appellants and cross-appellees.
 Walter B. Ash, Attorney, Department of Justice, Washington, D.C. (Perry W. Morton, Asst. Atty. Gen., Roger P. Marquis, Attorney, Department of Justice, Washington, D.C., James E. Holshouser, U.S. Atty., Boone, N.C., and John E. Hall, Asst. U.S. Atty., Greensboro, N.C., on brief), for appellee and cross-appellant.
 Before SOPER and HAYNSWORTH, Circuit Judges, and BOREMAN, District judge.
 HAYNSWORTH, Circuit Judge.
 
 
 1
 This case is here for the second time. See Martin v. United States, 4 Cir., 240 F.2d 326. We there held that the mere filing of a map by the State of North Carolina showing a strip of land one hundred feet wide and approximately one mile long, its center being the center line of an existing public road, was not a taking of private property within the boundaries of the designated strip. Mindful, however, that there may have been other acts constituting a taking, we remanded the case for further proceedings. Thereafter, additional evidence was taken, in much conflict in vital particulars, upon the basis of which the District Court found that the strip was surveyed in 1937, that boundary stakes remained in place for a few months during that year, and, thereafter, by improving the road, sodding the banks, sowing and mowing grass and keeping the entire strip free of debris, the United States, North Carolina's grantee, has exercised the dominion and control of which the strip is susceptible. He concluded that the exercise of such dominion was a sufficient taking, under North Carolina's laws, of the abutting owner's right of access to the public road, but he refused, upon equitable grounds, to order the closure of the existing connecting road.
 
 
 2
 Upon consideration of these cross-appeals, we take a somewhat different view, though we agree that the District Judge properly refused to enjoin the use and maintenance of the connecting road.
 
 
 3
 In 1936, Public Service Liberty Club, Inc. was the owner of a tract of land, north of the City of Greensboro, North Carolina, which contained approximately thirty-seven acres. It was bounded on the east by the Martinsville Road and on the north by an unimproved public road, known as the old East-West or New Garden Road. The old East-West Road runs westwardly from Martinsville Road to, and through, the site of the Battle of Guilford Courthouse.[1]
 
 
 4
 The battleground had been made a National Military Park, and the National Park Service desired to acquired and develop the old East-West Road as a park entrance. For that purpose, the North Carolina State Highway and Public Works Commission[2] prepared a map Park Service desired to acquire and develop long and one hundred feet wide, being fifty feet on either side of the center line of the old East-West Road, in the legend of which it was recited, 'Appropriation of Federal Parkway under chapter 2, Public Laws 1935 fee simple title to strip one hundred feet wide from station 0k00 to station 51k37.6 as shown in yellow.' A copy of this map was filed on October 15, 1936 in the office of the Register of Deeds for Guilford County, But was not registered or recorded, and was withdrawn or discarded. On April 14, 1937, North Carolina purported to convey the strip of land in fee simple to the United States, and the deed was properly registered on April 21, 1937.
 
 
 5
 More than a year later, the North Carolina Highway Commission learned that the map filed on October 15, 1936 had not been registered. On June 10, 1938 it filed another copy of the map, which was registered on that date.
 
 
 6
 Meanwhile in 1937-1938, the United States had improved the old East-West Road, surfaced it, sodded the banks and planted grass, and Public Service Liberty Club, Inc., in consideration of One dollar, had executed and delivered to the North Carolina Highway Commission a deed to a strip of land twenty feet wide and 1366.65 feet long (the length of its frontage on the old East-West Road), adjacent to the 'southern margin' of the East-West Road. In this deed, Public Service Liberty Club, Inc. reserved a general right of access to the East-West Road. This deed was never recorded; there is no showing that it was formally accepted by the Secretary of the Interior, (though the North Carolina Highway Commission was the grantee) and the United States does not claim under it, though, upon demand after these proceedings were commenced, it produced a photostatic copy of it.
 
 
 7
 In 1949 C. O. Martin, successor in title to Public Service Liberty Club, Inc., opened a new road through his land connecting a municipal park and picnic area to the south with the old East-West Road, and maintenance of this road was taken over by the North Carolina Highway Commission. Some years later, this action was commenced to enjoin the use and maintenance of the connection of this road with the old East-West Road, upon the ground that it was a continuing trespass upon lands of the United States.
 
 
 8
 Upon these facts we held that the filing of neither map was a taking of the property within the boundaries of the strip of land. The Act of January 23, 1935, Public Laws of 1935, ch. 2 G.S. 136-19, authorizes the Highway Commission to acquire or appropriate rights of way for the use of the United States and to convey them, free of claims for compensation, to the United States. It was authorized, in its discretion, to acquire title in fee simple to the needed lands, but was required to file, with the appropriate Register of Deeds, a map designating what had been acquired or appropriated. Title passes from the private owner to Naorth Carolina when the map is filed, but the acquisition or appropriation must be by other acts under the general laws for the procurement of lands for state highways. Judge Parker, speaking for this Court, said:[3]
 
 
 9
 'Under the Act of 1935, therefore, the Commission was authorized to acquire the land in question only by purchase, donation or condemnation, with right to enter upon and use the lands pending condemnation. The statute did, indeed, provide for the filing of a map with provision that title should vest in the Commission upon such filing; but this must be construed along with the other language of the section which clearly contemplated that such filing should be in addition to and not in lieu of the existing procedures required for condemnation, its purpose being to facilitate conveyance to the United States of title properly acquired by 'purchase, donation, or condemnation.' That such entry upon the property as would amount to a taking by the government was contemplated as a prerequisite to a valid condemnation, even if the map were filed as provided by the statute, is shown by the requirement that actions to recover compensation for land taken must be brought within six months, if notice of the completion of the project has been posted at the court house door of the county and at the end of the project, otherwise within twelve months of the completion of the project. General Statutes 136-19. The completion of the project is, in ordinary cases, a clear taking of the owner's property and notice to him of the taking. This is not true, however, where the project consists of the mere paving of an existing public highway. Such paving, where the rights of the public are unquestioned, would be no assertion of rights over adjacent land or notice to the owners that such rights were being asserted.'
 
 
 10
 Upon remand, evidence was offered that the land had been surveyed in 1937, and stakes were driven along the boundary, which remained in place for several months. About 1940, Martin constructed a fence, and a Park official testified that by actual measurement in two places in 1945 the fence was found to be fifty feet from the center line of the roadway. There was also testimony that the united States had kept the grass mowed and the strip free of debris to the line of the fence which was in place in the 1940's. All of this testimony was controverted in important particulars, but the District Court has made appropriate findings in accordance with it, which we accept, as we must.
 
 
 11
 If the question here was a simple boundary dispute, the findings would be quite sufficient to resolve it. Care of the strip by the United States for so many years and the concurrence of Martin's fence establishes that there had been either (1) a taking of an easement for highway purposes to the fence line, or (2) agreement upon the southern line of the twenty-foot strip adjacent to the 'southern margin' of the old roadway which had been conveyed in fee, with a general reservation of access, to the Highway Commission. That is not the question, however, for the United States asserts an extinction of the right of access, and there is no finding or testimony that there was ever any notice of a taking of that right.
 
 
 12
 In 1936, the abutting landowner had a general right of reasonable access to the roadway. Hedrick v. Graham, 245 N.C. 249, 96 S.E.2d 129; Sanders v. Town of Smithfield, 221 N.C. 166, 19 S.E.2d 630; Hiatt v. City of Greensboro, 201 N.C. 515, 160 S.E. 748. The right is a property right which may be appropriated for public purposes upon the payment of just compensation. Hedrick v. Graham, supra. The physical expansion, laterally, of the old public easement for highway purposes would not affect the abutting landowner's right of access, and the question is whether anything has been done which constituted a taking of that right so as to give rise to a right of compensation and give notice of the beginning of the period of limitations within which appropriate steps might be taken to determine and collect compensation. We find no such taking here.
 
 
 13
 The filing of the map, without registration, on October 15, 1936 was entirely nugatory. Without registration, it was incapable of giving notice to anyone, however careful he might be to ascertain and protect his rights. When North Carolina purported to convey the one hundred-foot strip in fee by its deed of April 14, 1937, it did not have the title it warranted. That deed immediately transferred to the United States no more than the public easement for the maintenance of the old roadway, though, by virtue of the warranty in the deed, it would suffice to transfer North Carolina's subsequently acquired rights in the strip of land. Hallyburton v. Slagle, 130 N.C. 482, 41 S.E. 877. The placement of the stakes in 1937, the grading and the improvements would give notice that the width of the old easement was being increased; but without any registered or other notice, would inform no one that rights of access were intended to be appropriated. This was in 1937, long before limited access highways were known in the area. See Hedrick v. Graham, supra. The abutting landowner had no objection to the widening of the right of way, and doubtless considered the improvement advantageous, for by the deed of March 1, 1938 it donated an additional twenty-foot strip, reserving, however, the right of access. Nothing which occurred on, or after, June 10, 1938, when the second map was filed and registered would give warning that the right of access had been, or was being appropriated. There is nothing to indicate that the landowner's deed of March 1, 1938 was ever returned, or was not accepted by the Highway Commission, and subsequent care of the land was wholly insufficient to put the landowner on notice that his right of access was being appropriated.
 
 
 14
 It is true that in our previous remand, it was contemplated that there may have been some acts of dominion which would notify the landowner of the taking of his property. What was shown to have been done establishes the fact of notice of the enlargement of the area devoted to highway purposes, and the landowner's consent to it, but does not suggest notice to the landowner that the property right of reasonable access to the roadway was taken or appropriated. The essence of our previous decision was that, under the laws of North Carolina, acts or conduct cannot be a taking of property unless reasonably calculated to give notice to the owner of the appropriation of his property. There has been no such notice of appropriation of the right of access here, and no taking of it.
 
 
 15
 We think no injunction should have been issued unless conditioned upon the prompt acquisition by purchase or condemnation of the defendants' rights of access, and that, in default of such acquisition, the complaint should be dismissed.
 
 
 16
 Affirmed in part; reversed in part, and remanded.
 
 
 17
 On Petition for Rehearing.
 
 
 18
 HAYNSWORTH, Circuit Judge.
 
 
 19
 In a petition for rehearing, the United States reads our opinion to apply broadly to unequivocal situations in which the condemning authorities have done nothing to mislead the landowner. Our opinion does not warrant the interpretation or suggest that a landowner who has actual or constructive notice of a taking in fee may, nevertheless, retain some interest in the land.
 
 
 20
 The landowner here was affirmatively misled. He gave a deed, reserving the right of access, which the Highway Commission accepted; at least the deed was not returned to the landowner, and neither the Highway Commission nor the United States ever disclaimed it. If the strip which the Park Service kept cut and free of debris was somewhat wider than it could strictly claim under the deed, that was hardly notice to the landowner that rights were being asserted which were inconsistent with the expressed reservation in the deed. They built no wall. They posted no notices. They did nothing reasonably calculated to inform the landowner that his reserved right was being appropriated.
 
 
 21
 The landowner had no constructive notice of a taking of his reserved right of access. The map was not registered until the work was done. At the time when a prudent landowner might have searched the public records to determine whether his land or his reserved right of access was being appropriated, he would have found nothing.[4]
 
 
 22
 Here the landowner was interested only in the right of access. He was willing to donate the land subject to that right. He gave a deed reserving that right. Retention of the deed and the absence of any disclaimer of it justified his continuing belief that his reserved right was protected and preserved. If, then, the reserved right was to be appropriated, he was entitled to notice of the taking.
 
 
 23
 He was given no such notice.
 
 
 24
 The petition for rehearing is denied.
 
 
 
 [1]
 Though nominally a British victory, it marked the end of Lord Cornwallis' campaign in the Carolinas, during which the British had suffered such attrition, including the annihilation of Tarleton's forces at Cowpens and those of Ferguson at King's Mountain, that after Guilford Courthouse, the British offensive strength was so blunted and their numbers so diminished that Lord Cornwallis withdrew to the coast at Wilmington, from whence, abandoning further effort in the Carolinas, he moved to Virginia and the entrapment at Yorktown
 
 
 [2]
 Hereinafter called Highway Commission
 
 
 [3]
 240 F.2d 329
 
 
 [4]
 Such a prudent person would search for a record of condemnation proceedings and for the registered map required by the Act of January 23, 1935. He would have no occasion to examine the records of subsequent conveyances by his own grantee and would not have found the record of the deed from North Carolina to the United States. The record of that deed was not constructive notice to him that his remote grantee claimed more than he conveyed. See Turner v. Glenn, 220 N.C. 620, 18 S.E.2d 197